## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JOHNATHAN SEXTON,                                    Case No. 1:14-cv-98

        Plaintiff,                                 Black, J.
                                                    Bowman, M.J.
    v.

JOSEPH LEE, et al.,

        Defendants.


### REPORT AND RECOMMENDATION

### I. Background

Plaintiff, presently a prisoner at the Marion Correctional Institution, filed this *pro se* civil rights action against Hamilton County and Colerain Township police officers Joseph Lee and Scott Owens, as well as Hamilton County Sheriff Jim Neil, under 42 U.S.C. §1983.[1] Plaintiff's claims arise from the events of October 4, 2012, when Plaintiff alleges that "a federal search warrant was executed on my house." (Doc. 3 at 5). Undisputed evidence offered by Defendants confirms that the United States Department of Homeland Security (USDHS) executed a search warrant at Plaintiff's residence, and that Officers Lee and Owens were present as local law enforcement

---

[1]Shortly before filing this action, the same Plaintiff filed an unrelated complaint under 42 U.S.C. §1983 against Hamilton County Sheriff Jim Neil and two correctional officers at the Hamilton County Justice Center ("HCJC") alleging that his constitutional rights were violated during his incarceration at that facility as a pretrial detainee. *See Sexton v. Neil*, Case No. 1:14-cv-26 (Dlott, J). Claims against the two correctional officers were dismissed on November 17, 2014, and the undersigned recently recommended that the sole remaining claims in that case be dismissed, pursuant to Defendant Neil's motion for summary judgment.

assisting USDHS.  Plaintiff alleges that Lee and Owens searched his house during the execution of the warrant:

> Lee had opened my safe and gained access to an envelope containing $15,500.  Lee took the money out of my safe and then took it to another location in the house.  He called an informant of his at 5/3 Bank and began to inquire about my financial history.  After the federal investigators were done interviewing me, Sgt. Owens questioned me about my Fathers two rifles that were in his bedroom.  He and Lee made the decision to arrest me for possessing my Dads two rifles.  Before I was handcuffed, I inquired to both Lee and Owens as to where my money was.  Lee replied "Don't worry about it because you're a drug dealer and can always get some more."  I was then searched and taken to the Hamilton County Justice Center.  Upon arriving at jail, I called home.  I told my Father and Mother about the days events.  I asked my father to locate my money.  He said it was on the kitchen table but that it was not all there.  Roughly $1,500 was missing.

(*Id.* at 5).  Plaintiff alleges that the officers seized his father's guns without leaving a "chain of custody or property receipt," and that he called Hamilton County Internal Affairs and reported the "missing money" and "illegal search into my financial history." (*Id.*).  Plaintiff's complaint further alleges that after agreeing to a plea deal, the prosecutor changed her mind and withdrew her offer based on input from Defendants Lee and Owens, who expressed to Plaintiff's attorney that they were "angry about me calling internal affairs" and "told the prosecutor that if the charges were dropped they could be sued and held liable."  (*Id.* at 5-6).  Plaintiff proceeded to trial and was found guilty.  He alleges that Defendant Lee submitted a false statement against him, which negatively impacted his sentence.  Plaintiff was sentenced to a prison term of thirty months, a sentence that was affirmed on appeal.

Plaintiff's complaint alleges that Defendants violated the Fourth Amendment by conducting "an illegal search of Plaintiff's financial history and records without a warrant or subpoena," and violated the Fourteenth Amendment by retaliating against Plaintiff for

contacting Internal Affairs regarding "missing" money by "sabotaging a plea agreement and later making false claims during a Pre-Sentence Investigation."  He also alleged "deliberate indifference of key supervisors." (Doc. 3 at 7). Plaintiff's complaint seeks $100,000 in compensatory damages and the same amount in punitive damages from each Defendant.  (*Id.*).

Upon initial screening pursuant to 28 U.S.C. §§1915(e)(2)(B) and 1915A(b), most of Plaintiff's claims were dismissed *sua sponte*.  (Doc. 4 at 6, explaining that "most …allegations fail to state an actionable claim for damages under 42 U.S.C. §1983."). Specifically, this Court dismissed claims stemming from: (1) the search and seizure of firearms from plaintiff's residence; (2) the search and seizure of plaintiff's "financial history and records" from Fifth/Third Bank; (3) the two police officers' interference with a plea bargain that was initially offered but later withdrawn; and (4) false statements allegedly made by defendant Lee in the PSI report that was submitted to the trial court for consideration in determining plaintiff's sentence.  (Doc. 8 at 1).  However, the undersigned found that Plaintiff's allegation "that he is missing $1500 from the money that Lee and Owens took from his safe and moved to another location in his house" was sufficient to state a Fourth Amendment claim that was "deserving of further development."  (Doc. 4 at 11-12).

For the reasons that follow, I now recommend that the Defendants' separately filed motions for summary judgment be GRANTED, and that Plaintiff's remaining Fourth Amendment claim be dismissed.

**II.  Analysis**

**A. Summary Judgment Standard**

In a motion for summary judgment, a court must view "the facts and any inferences that can be drawn from those facts – in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)) (internal quotation marks omitted).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment – rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that the facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations.  After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).  In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

4

The non-moving party's evidence "is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Id.* at 255 (emphasis added).  The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

Although reasonable inferences must be drawn in favor of the opposing party, *see Matsushita*, 475 U.S. at 587, inferences are not to be drawn out of thin air.  To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*, 475 U.S. at 586-87 (citation omitted).  It is the plaintiff's burden to point out record evidence to support his claims. "[T]he Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims." *Abdulsalaam v. Franklin County Bd. of Com'rs*, 637 F. Supp.2d 561, 576 (S.D. Ohio 2009) (citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007)).

**B.  Grounds Asserted in Defendants' Motions**

Both Defendants argue that they are entitled to summary judgment based upon evidence that no rational trier of fact could find that any money was ever taken from Plaintiff by anyone.  Defendants additionally argue that undisputed evidence shows that, even if this Court determines that a question of fact exists concerning whether any money was missing, there is no evidence that could support Plaintiff's contention that either of the named Defendants took his money.

The undersigned is persuaded, based on undisputed evidence in the record, that no cash was illegally seized during the execution of the warrant.  To the extent that a reviewing court would disagree and conclude that Plaintiff has produced sufficient evidence to show any *genuine* issue of material fact concerning whether any of his cash was missing, the undersigned alternatively concludes that Defendants remain entitled to judgment as a matter of law based upon the lack of any evidence that either Defendant participated in any such seizure.  Last, both Defendants are entitled to qualified immunity.

### 1.  Evidence that No Cash Was Seized During Execution of Warrant

Plaintiff's complaint rests on the fundamental premise that cash belonging to Plaintiff was seized by the two Defendant officers during the execution of the warrant by USDHS.  However, Defendants have offered undisputed evidence that Plaintiff's father counted Plaintiff's cash immediately following Plaintiff's arrest and confirmed to Plaintiff that no cash was missing.  Absent the unlawful seizure of Plaintiff's property, Defendants are entitled to judgment as a matter of law.

Shortly after he was arrested and taken into custody at the Hamilton County Justice Center, on October 4, 2012, around 3:30 p.m., Plaintiff used the telephone to speak with his father.  Both the audio CD, and written transcriptions of their multiple telephone conversations, have been filed by Defendants in support of their motion for summary judgment.  Those recorded conversations flatly contradict the central allegations in Plaintiff's complaint that his father informed him that money was missing.

According to the complaint, Plaintiff "asked my father to locate my money.  He said it was on the kitchen table but that it was not all there.  *Roughly* $1,500 was

missing." (Doc. 3 at 5, emphasis added). However, Plaintiff does not dispute the veracity of the transcriptions of telephone conversations with his father from the HCJC. The audiotapes and transcripts,[2] together with Defendants' affidavits, confirm that there is no *genuine* issue of material fact on the central issue of whether any cash was taken.

Plaintiff's telephone conversations with his father specifically confirm that no money was taken during the search. In Plaintiff's initial conversations,[3] he talks to his father about the search, including his arrest on gun charges, and officers locating and questioning him about a large sum of cash that they found:

> FATHER:  What the, where you at now?
>
> PLAINTIFF:  They came to the house and raided it with a search warrant, the FBI and they said they had received an email about me being in a gang and trying to smuggle in drugs into the airport and stuff.
>
>     \*\*\*
>
> PLAINTIFF:  Then they arrested me for, and they said because you had those guns up there, they took those and they charged me with having a gun.

(Doc. 18-3, Transcript at 1, PageID 223).

> PLAINTIFF:  An anonymous tip in January that I was, with working with April to bring drugs into the airport. That's –
>     \*\*\*
> FATHER:  Why don't they f--- go to her house then, if that's the problem is there, and have her f--- ass arrested?
>
>     \*\*\*
>
> PLAINTIFF:  He said, "well, we will be in touch about this, this conspiracy." *Then they asked me about my money.*
>
>     \*\*\*

---

[2] The undersigned has quoted the transcripts extensively to provide context whenever Plaintiff and his father discussed the bag of cash.

[3] Multiple sequential conversations were recorded and transcribed, due in part to the fact that the jail telephone is pre-programmed to hang up after a limited number of minutes, resulting in multiple call-backs for longer conversations.

PLAINTIFF:  And then said that I, like I said, took the guns and said I wasn't allowed to have –

FATHER:  Oh, that's bullshit….

PLAINTIFF:  *And then they asked me about my money that I had in the safe and they said, "Well are you dealing –"*

FATHER:  It's none of their God damn f--- business.

(*Id.* at 5-6, PageID 227-228, emphasis added).

The discovery of a large quantity of cash kept by Plaintiff in a 5/3 bank bag clearly (and somewhat understandably) elicited suspicion.  Plaintiff alleges that Lee accused him of gaining the cash from some illegitimate source, such as drug dealing. Plaintiff repeatedly instructed his father to locate the bag of cash, in order to obtain Plaintiff's future release on bond:

FATHER:  Well, get you a public defender, get your ass out of there.

PLAINTIFF:  I don't know.  *They tried to take my money and said I was, asked me if I was a drug dealer and stuff.*

FATHER:  Drug dealer, my ass.

PLAINTIFF:  *But you need to keep that money in case I have a high bond or something.*

FATHER:  Well, I don't even know where it's at.

     ***

PLAINTIFF:  It should be on my bed.

FATHER:  Your bed's a mess.

PLAINTIFF:  Well, just look for it on there.  Or it might be back in the safe.

     ***

PLAINTIFF:  The police said they put it back in there so.

FATHER:  What.

PLAINTIFF:  He said he left it in there.

(*Id.* at 11-12, PageID 233-234, emphasis added).

PLAINTIFF:  Well, I don't know what else is all going on dad but, if you have got to find (inaudible).

FATHER:  Well, I don't know?

PLAINTIFF:  Keep it somewhere and use it to pay my bond because it's probably going to be a high bond but. . ..

(*Id.* at 14, PageID 236).

PLAINTIFF:  Well, just find the money and then have my mom come down and handle it tomorrow whatever they decide.

FATHER:  Alright.

(*Id.* at 16, PageID 238).

Plaintiff and his father continued to discuss more mundane matters, such as the care of his dog, cleaning up the mess made by the dog, and an anticipated phone call from social security, before Plaintiff returned to the subject of the cash:

PLAINTIFF:  A lady from Social Security will probably call.  If not, she will send you something in the mail.

FATHER:  Alright.

PLAINTIFF:  But don't answer it if you see it's from Social Security.  Other than that I don't know what else to do, *just find that money in my bedroom* and clean up what you can.

(*Id.* at 18-19, PageID 240-241, emphasis added).

In the next portion of the transcript, Plaintiff's father eventually locates the bag of cash where the officer told Plaintiff he had left it.

PLAINTIFF:  You there?

FATHER:  Yeah.

PLAINTIFF:  All right.  Did you find that money yet?  Do you see it in there?

FATHER:  No I can't find anything in here right now.  It's all tore up.

PLAINTIFF:  What did Scrambles tear up, is he alright?[4]

     \*\*\*

PLAINTIFF:  Well that guy said he left (inaudible)

FATHER:  Talking to mom right now…

PLAINTIFF:  Well that guy said he left it (inaudible) or on the bed.

FATHER:  Huh?

PLAINTIFF:  He said he put it in the safe or on the bed.

FATHER:  Put what on the bed?

PLAINTIFF:  My bag of money.   I wonder if it's still –

FATHER:  I have no idea where anything's at.  It's just a big pile of – of whatever.  Crap all over here.  He probably put it in his damned pocket is what he meant.

PLAINTIFF:  Probably.

FATHER:  Okay.  There's no money on this bed.  It's hard to say, I mean it's just –

PLAINTIFF:  I mean this stuff –

FATHER:  *Yeah.  Here's the money in a bag.*

PLAINTIFF:  A blue bag.

FATHER:  Yeah. ….

(*Id.* at 32-33, PageID 253-255, emphasis added).

---

[4]Scrambles is the name of Plaintiff's dog.

After Plaintiff's father located the blue bank bag containing the cash, the transcript reflects discussion of the fact that Plaintiff's mother had taken cash from the same bag in order to post bond for Plaintiff on a prior arrest on other charges within a day or so of his arrest on the gun charges.

FATHER:  Yeah….Anyway.  Well now how did you get bond the last time?

PLAINTIFF:  Well my mom came down and did it.

FATHER:  Must have been my check or something?

PLAINTIFF:  *No, it was my money*.

FATHER:  Huh?

PLAINTIFF:  *She took it out of there*.

FATHER:  Out of what?

PLAINTIFF:  *Out of that – my pile of money*.

FATHER:  All right.

PLAINTIFF*:  Stuff that's in that blue bag*.

(*Id.* at 33, PageID 255).

In the next portion of the transcript, Plaintiff and his father discuss how much money is contained in the blue bag.  There is undisputed evidence that the cash was bundled in stacks of bills in $1,000 increments.  (*See, e.g.*, Doc. 28-3 at 4). The audio recording contains a recognizable sound of a zipper on the bag being pulled.  Plaintiff pauses before responding to his father's question asking how much money the bag contains, before giving a range as an estimate of the amount.  However, the transcript also reflects that his father counts up the cash while they are on the phone, and reports back to Plaintiff that it contains $15,000:

11

FATHER:  How much was in here?

PLAINTIFF:  Maybe like –

FATHER:  *You there?*

.

PLAINTIFF:  *Yeah.  I'm thinking maybe $15,000 or $14,800.*

FATHER:  *There's 10, 11, 12, 15 thousand.*

PLAINTIFF:  Probably need to count it but.

FATHER:  Well how did – how did – I'm saying how did she post bail the last time?

PLAINTIFF:  She just paid cash.

FATHER:  She paid cash?

PLAINTIFF:  Yeah.  Down here.

(*Id.* at 33-34, PageID 255-256, emphasis added).  The audio recording contains pauses as Plaintiff's father counts the money.  A zipper sound, presumed to be the sound of Plaintiff's father closing the bag, can be heard on the audio recording shortly after he completes his count of the money.

Plaintiff reiterates the need to allow his mother to access the bag of money so that she can post bond.

PLAINTIFF:  I said, "Now, make sure my mom has that money in case she has to come down here and bond me out but.

FATHER:  Alright.

PLAINTIFF:  But it won't be until about 9:00 o'clock.

FATHER:  Alright.  I'll put it out here in case she needs it….

(*id.* at 45, PageID 267).

12

In the last portion of their conversation, Plaintiff's father confirms that no amount of money is missing from the blue bag, based upon Plaintiff's prior estimate that there was $15,000 in cash, and Plaintiff's father specifically having audibly counted out the sum of $15,000:

> PLAINTIFF:  Well, you gotta, like I said, you talk to the guy and have her see if she can get in touch with that attorney and a public defender and –
>
> FATHER:  Alright.
>
> PLAINTIFF:  And let her have that money or at least access to it so she can pay to get me out but make sure you count it first.
>
> FATHER:  *I already did.*
>
> PLAINTIFF:  How much did they, they shouldn't have taken anything but –
>
> FATHER:  *They didn't take anything*, the [sic] only wrote down what they took.  Something about some floppy disc and I don't know, the computer and some other stuff they took.

(Id. at 47-48, PageID 269-270, emphasis added).

Thus, the transcript leaves no doubt that Plaintiff's father had possession of the money, reported to Plaintiff that no money was missing, and counted $15,000 in the bag.  Plaintiff's father agreed to Plaintiff's request to hold onto the cash and/or to make sure that it remained accessible to Plaintiff's mother for future payment of Plaintiff's bond, pursuant to Plaintiff's express instructions.

> FATHER: I'll talk to Seth and then I will give this information to your mom and hold onto this money and see what's going on after that.

(*Id.* at 49, PageID 271).

> PLAINTIFF:  Let her have that money so she can pay my bond.
>
> FATHER:  Alright.  Bye.

(*Id.* at 55, PageID 277).

A couple of days later, on the evening of October 6, 2013, Plaintiff was still in jail awaiting release on bond.  In a conversation recorded on that date, Plaintiff refers to money being "lost" from Plaintiff's cash reserves due to Plaintiff's mother having used a bondsman to post bail:

> PLAINTIFF:  I feel bad about how I lost all my money over this stuff.
>
> FATHER:  Well, we will, I, I don't know if you, I wouldn't consider it gone right yet.
>
> PLAINTIFF:  I mean (inaudible) and I wanted to pay that bondsman and I'll never get that back.
>
> FATHER:  Well, I don't know.  Did the attorney tell you that or did mom, your mom.
>
> PLAINTIFF:  That's just how it goes.  Unless you put the money through the county then you get it back but if you pay a bondsman then you don't.
>
> FATHER:  Why would she do that?
>
> PLAINTIFF:  She just didn't have time, I guess.

(*Id.* at 88-89, PageId 310-311).

In the final reference to items taken during the search, Plaintiff's father once again confirms that nothing was taken other than what was reported during the execution of the warrant:

> PLAINTIFF:  Did they take all my movies and smash them or what did they do with them?
>
> FATHER:  What movies?
>
> PLAINTIFF:  In my bedroom, all my, all my things I had?
>
> FATHER:  They just piled them up there, I put them all away.  They didn't smash them or anything they just put everything in a, on the mattress.  That's all they did.  I cleared it all off.  There is nothing gone other than that stupid computer and that's about it so….

14

(*Id.* at 100, PageID 322).

Plaintiff does not contest the accuracy of the audio recordings made of his phone calls, nor does he contest the accuracy of the written transcripts of those recordings. (Doc. 25-1 at 1, ¶7).  Faced with strong contemporaneous proof that no money was taken during the search, Plaintiff has filed his own affidavit asserting that he was "concerned about the condition and whereabouts of my money due to statements made …insinuating that I was a 'drug dealer.'"  (Doc. 25-1 at 4, ¶8).  He further asserts in the affidavit that he (Plaintiff) "was never afforded the opportunity to witness it [the money] being counted, handled or see where it was put."  (*Id.* at ¶9).  Plaintiff further states that he called his father and "as soon as I was admitted into the Hamilton County Justice Center, and told him to locate and count my money, because I was concerned by the fact that Lee would not allow me to count or verify that my money was all there…." (Doc. 28-2 at ¶7).

There is nothing in the audio recordings or in the written transcripts that supports Plaintiff's recent explanation that he contacted his father for the purpose of verifying any suspicion that his cash was taken.[5]  Rather, the transcripts encompass multiple subjects of conversation, with the conversations relating to the cash focused on Plaintiff's intent to use it toward his bond, and no mention of Plaintiff's alleged request for an accounting at the time of the search.

Ironically, Plaintiff's own exhibits add circumstantial evidence to the body of proof that no money was taken during the search.   Plaintiff has filed, as Exhibit B to his

---

[5]Plaintiff also denies in his response in opposition that his father counted the money during their conversations, contrary to the clear evidence of the audiotape and corresponding transcripts.

response in opposition to Defendant Lee's motion for summary judgment, the second page of a "Memo From the Desk of Investigator Steve Minnich, Internal Affairs Section." The document responds to a complaint made to Internal Affairs by Plaintiff Sexton about Defendant Lee and reads, in pertinent part:

> It is to be noted that if there were any problems with the search warrant, those issues would have to of [sic] dealt with during the trial. Jo[h]nathan also accuses Cpl. Lee of calling his bank, 5/3rd and he (Lee) asked them if Johnathan had withdrawn $15,000.00. Johnathan felt as though Lee acted illegally by calling his bank. Cpl Lee was asked about this allegation and he admitted that he had called 5/3rd bank because he found some sort of poison under Johnathan's bed and thought he may have been selling the substance. Cpl. Lee went on to say that Johnathan had told him that he had just withdrawn the money recently in order to buy a car and Cpl. Lee called the bank to confirm what Johnathan told him. He said that he does not have an informant at the bank. By calling the bank Cpl. Lee was able to confirm what Johnathan told him. It is to be noted Cpl. Lee is allowed to call the bank for information but if it is against the bank's policy to release information then they should have told Cpl. Lee. Cpl. Lee did nothing wrong by calling the bank. The next allegation is that Cpl. Lee refused to let Johnathan take a plea bargain in court because he (Lee) feared a law suit if any of the charges were dropped. Johnathan writes that Lee went to Assistant Prosecutor Jennifer Deering's supervisor in order to make Prosecutor Deering take the case to trial. I contacted Prosecutor Deering on October 28, 2013 and asked her about Johnathan Sexton's trial and why the plea bargain was not accepted. Prosecutor Deering said that the reason the plea did not go through was because the case against Johnathan was very strong…..

> I request that this case be closed as unfounded….

(Doc. 28-3 at 2). Thus, the investigatory report, through circumstantial evidence, confirms that the amount in the bank bag was $15,000.00 in cash, the same amount that can be heard on the audiotape to have been counted out by Plaintiff's father.

Plaintiff apparently – and erroneously - believes that because he was not in the room to witness the discovery of the bag of money, that fact alone creates "a genuine issue of material fact" as to whether any money went missing. Plaintiff is mistaken;

Plaintiff's sworn statement that he was unable to watch Officer Lee is not sufficient to prove that money disappeared during Officer Lee's brief interaction with it, particularly in light of the telephone records and affidavits to the contrary offered by Defendants. Indeed, there is no dispute that multiple officers were present besides Lee during the execution of the federal warrant, including during Lee's interaction with the bag of cash. (*See, e.g.*, Doc. 28-3 at 4, "Joseph Lee handled the money and was witnessed by Joseph Bennett, Sheriff's Corporal, Hamilton County Sheriff's Office, and other members of the investigation team who were inside this residence at the time of the search warrant.").[6]  Plaintiff complains that the Defendants have failed to offer additional affidavits from Officer Bennett or others, but there is no requirement to do so when the evidence is undisputed as it is in this case.

As additional evidence in opposition to summary judgment, Plaintiff has offered the affidavit of his father.  Plaintiff's father's affidavit now asserts that the father "made contradictory statements over the phone to my son while he was in jail…[and] told him his money was all there so as not to upset him anymore than he already was."  (Doc. 25-1 at 5, ¶7).  However, the transcripts of the recorded calls are <u>not</u> contradictory but instead consistently report that no money was taken, and that $15,000 was found in the bag, in accord with Plaintiff's <u>estimate</u> of the amount of cash he had on hand.  The only contradiction that exists at all is in the *recent and new* explanation of events provided by Plaintiff's father in response to summary judgment.

In his recent affidavit, Plaintiff's father now alleges:

---

[6]Plaintiff also argues that Lee never presented evidence that anyone verified Lee's count of the money, but Lee never stated that anyone verified the count; rather he asserted only that there were witnesses present while he was handling the money.

8.  I saw a pile of money in my sons bedroom after the search was concluded, but I did not physically count all of the money, bill for bill.

9.  My son, upon arriving home from jail on October 9th, 2012, immediately counted his money and advised me that $1,500.00 was missing.

(*Id.*).   Like Plaintiff's own affidavit, his father's newly conceived explanation and reinvented story - that it was Plaintiff himself who discovered the "missing" money after he returned home, as opposed to Plaintiff's contradictory allegations in his complaint that it was his father who counted the money and reported $1500 missing on the date of the arrest – is insufficient to create a *genuine* issue of material fact on this critical issue. In the audiotape and the transcripts, it is clear that Plaintiff's father did not see "a pile of money" but instead located the blue bank bag in which the cash was located.  He then unzipped the bag and can be heard to count the money, before reporting that it was all there and totaled $15,000.  No rational trier of fact could find otherwise.

### 2.  Defendant Owens' Lack of Involvement

In addition to the lack of evidence to controvert Defendants' evidence that no money was taken at all, Defendant Owens persuasively argues that he is entitled to judgment as a matter of law based upon his personal lack of involvement.  First, it is notable that Plaintiff does not allege in his complaint that Officer Owens had any contact at all with the bag of cash.  Plaintiff's complaint alleges that only Officer Lee had any such contact or involvement with Plaintiff's money.  "Lee had opened my safe and gained access to an envelope containing $15,500.  Lee took the money out of my safe and then took it to another location in the home.  He called an informant of his at 5/3 Bank and began to inquire about my financial history."  (Doc. 3, Complaint at p. 5).

18

As opposed to the allegations that Officer Lee opened the safe, found the money, and questioned Plaintiff about it, the only allegations against Officer Owens are that he questioned Plaintiff about *rifles* that were found, and that Owens participated in Plaintiff's subsequent arrest on gun charges.  Officer Owens' mere presence in the home at the time of the discovery of the cash does not provide any basis for liability against that Defendant.

In response to Defendant Owens' motion, Plaintiff concedes that "there is no physical proof that Defendant Owen[s] was involved in the [alleged] theft of the plaintiff's money…."  (Doc. 25 at 3).  Still, and ignoring the fact that Plaintiff bears the burden of proof to show that Defendants violated his constitutional rights, Plaintiff seems to argue that summary judgment should be denied because Owens has offered "no physical proof to show that he was not involved." (*Id.*).  Plaintiff argues strenuously that Owens should be held liable as the "supervisor on scene." (Doc. 25 at 2).  However, as stated in the prior R&R, "[i]t is well settled that the doctrine of *respondeat superior* does not apply in §1983 lawsuits to impute liability onto supervisory personnel."  (Doc. 4 at 6, citing *e.g. Wingo v. Tennessee Dep't of Corr.*, 499 Fed. Appx. 453, 455 (6th Cir. 2012)(*per curiam*), additional citations omitted)).

Plaintiff also argues that Officer Owens should be held liable under §1983 based upon his alleged failure to "witness or validate that the money…was being counted and handled in a manner that coincided with his department['s policy."  (*Id.* at 1).   In support of that allegation, Plaintiff has attached to his response a copy of a page taken from what appears to be a police policy and procedures manual, specifying that when "discovering an article subject to seizure, the finding officer will summon a witnessing

19

officer," and that when cash is seized, a "supervisor will witness the counting and handling of large sums of money and other valuables."   (Doc. 25-2 at 5, Plaintiff's Exhibit C).

For two reasons, Plaintiff's allegation that Officer Owens failed to comply with department policy does not preclude summary judgment.  First, the presumed "policy" does not apply to the situation at hand, insofar as none of the cash was in fact "subject to seizure" from the home.  Second, an alleged violation of a departmental policy is not equivalent in this instance to a Fourth Amendment violation, which precludes only unreasonable search and seizure.

### 3. Qualified Immunity

Defendant Lee additionally argues that he is entitled to qualified immunity, which applies to any government official engaged in the performance of discretionary functions, absent allegations that his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).    To the extent that both Defendants have established that no Fourth Amendment violation occurred because no money was taken by either Defendant during the execution of the federal search warrant, both Defendants are entitled to qualified immunity.   Officer Owens is also entitled to qualified immunity based upon the failure of Plaintiff to allege his personal involvement in the alleged theft, beyond his failure to "supervise."   *See also generally Heyne v. Metropolitan Nashville Public Schools*, 655 F.3d 556, 564 (6th Cir. 2011)(holding that in order to recover damages against a government official, a plaintiff allege with particularity "facts that

demonstrate what *each* defendant did to violate the asserted constitutional right," internal quotation marks and citation omitted).

### 4. Officer Lee's Alleged Involvement

Defendant Lee points out that, although Plaintiff alleges that Lee was the officer who discovered the money, physically handled it, and questioned Plaintiff about its origins, Plaintiff's complaint does not directly allege any personal knowledge that Lee took the allegedly missing $1500. Rather, the complaint alleges only circumstantial evidence - that Plaintiff's father alerted Plaintiff that $1500 was missing. As previously discussed, that specific allegation is refuted by contemporaneous telephone records. In addition, Defendant Lee has filed an affidavit in which he denies taking any of Plaintiff's cash at any time during the search or after. Lee's affidavit states that, on completion of the search, he placed the money back inside the bag in which he found it and left it in the bedroom where it was originally located.

Plaintiff's complaint further alleges that four days later *after* he was bonded out of jail, Plaintiff returned home and began to "piece together what had occurred." Thus, even Plaintiff's complaint offers no more than conjecture and implication concerning Lee. Plaintiff never specifically alleges in his complaint or even in his recent affidavit that Lee stole any money, but only that Lee questioned him about the money during the search, and that Plaintiff later discovered (or his father) discovered that money was "missing."

Defendant Lee argues that Plaintiff's "fill-in-the-gaps" assertion is insufficient to show that Lee took Plaintiff's money in violation of the Fourth Amendment. Telephone records reflect that Plaintiff's mother used some of the money from the bag to bond

Plaintiff out on unrelated charges a day or two before the execution of the federal warrant. The same records confirm that the bag of money remained in Plaintiff's father's possession for some period of time, although Plaintiff also instructed his father to make sure the money remained accessible to Plaintiff's mother for her to use as needed for his additional bond.

### III. Conclusion and Recommendation

Based upon the totality of the record as a whole, the undersigned finds no genuine issue of material fact exists, and that Defendants are entitled to judgment as a matter of law. For the reasons stated, **IT IS RECOMMENDED THAT:**

1. The motions of Defendants Lee and Owens for summary judgment (Doc. 18, 19) should be GRANTED;

2. All other pending motions, including Plaintiff's motion to appoint counsel (Doc. 23) should be denied as moot, and

3. This case should be DISMISSED and CLOSED.

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**


JOHNATHAN SEXTON,                                        Case No. 1:14-cv-98

            Plaintiff,                                           Black, J.
                                                                Bowman, M.J.
      v.

JOSEPH LEE, et al.,

            Defendants.


**NOTICE**

      Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN  (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).